[No. A030526. First Dist., Div. Three. Feb. 24, 1987.]

MULTIPLEX INSURANCE AGENCY, INC., Plaintiff and Respondent,
v.
CALIFORNIA LIFE INSURANCE COMPANY, Defendant and
Appellant.

COUNSEL

Ashley & Ashley and Stephen S. Ashley for Defendant and Appellant.

Herbert W. Yanowitz for Plaintiff and Respondent.

OPINION

WHITE, P. J.—On May 24, 1983, plaintiff and respondent Multiplex Insurance Agency, Inc., filed a complaint for breach of fiduciary duty, tortious breach of implied covenant of good faith and fair dealing and breach of contract naming appellant California Life Insurance Company as defendant. The complaint was based upon appellant's refusal to pay respondent certain commissions purportedly due under the contract appointing respondent as a nonexclusive general agent for the sale of appellant's insurance policies. The jury with two jurors dissenting returned a general verdict in respondent's favor, awarding respondent $9,377.71 in general damages and $100,001 in punitive damages. Judgment was entered accordingly. Appellant moved unsuccessfully for a new trial and for judgment notwitstanding the verdict. After appellant's motions were denied, it filed a timely notice of appeal.

Appellant contends on appeal that (1) the law does not recognize a tort cause of action for bad faith in contract cases outside the fields of insurance and wrongful employee discharge; (2) if a cause of action for bad faith is recognized outside the realms of insurance and wrongful discharge, it should not be applied to contracts like respondent's general agent's contract; and (3) it would be unfair and unconstitutional to apply a tort cause of action for a breach of a covenant of good faith and fair dealing since this area was only broadened after appellant and respondent entered into their contract.

Respondent was an insurance agency organized in 1962 by six founders, including Mr. Milburn Fort, who had been in the insurance business since 1932 and was licensed to do business in about 15 states.[1] Fort subsequently bought out the other founders of respondent, and he and his family became the owners and officers of the corporation. On May 19, 1977, respondent became a general agent of appellant, an insurance company engaged in the business of providing life insurance policies.

Appellant and respondent followed the industry practice of compensating the general agent through commissions on sales of the insurance policies. Respondent received 90 percent of the premiums during the first year that each policy was in effect; in subsequent years it received 10 percent. Commissions earned in subsequent years were referred to by the witnesses as "renewal commissions." This case concerns a dispute between appellant and respondent as to certain renewal commissions.

To finance respondent's beginning expenses in selling appellant's insurance policies, appellant advanced respondent 60 percent of the expected annual payment of premiums on the policies. Advances to agents were referred to by the witnesses as "debit accounts." As the policyholders paid their monthly premiums, respondent's commission on each monthly premium payment was credited against the advance. Respondent, in turn, made similar arrangements with its subagents, who actually sold the insurance policies. Respondent paid each subagent a 45 to 65 percent commission, depending on the subagent's experience and the time required to train him. Respondent also made advances to the subagents, and the subagent's commission on each monthly premium payment was credited against his advance from respondent.

Fort testified that as of September 1984, appellant owed respondent $9,377.71 in renewal commissions. These renewal commissions were attributable to the policies respondent sold prior to respondent's merger with

---

[1] At the time this case came to trial Fort was 76 years old.

Merit. The real problem surfaced because in 1978, Fort decided to wind up the affairs of respondent and to form Merit with five other individuals or entities. It was the understanding of the parties forming Merit that the renewal commissions would belong to respondent. What is unclear is whether this intention was ever disclosed to appellant. Fort testified that at the time he was forming Merit he told Russell Harrar, the agency vice-president of appellant, that he was getting old and wanted to get out of the insurance business. Fort testified that he told Harrar that he had made arrangements to form Merit so that he could stop being involved in day-to-day business operations and could look forward to living off renewal commissions.

On March 23, 1978, Fort wrote appellant a letter in which he stated: "Multiplex Insurance Agency, Inc. has joined forces with [Merit], a newly formed corporation which will hereafter be responsible for all production and debit balances heretofore the responsibility of Multiplex. [¶] Effective April 1, 1978, you are hereby instructed to transfer all Sub-General Agents and Agents accounts from Multiplex Insurance Agency, Inc. to [Merit] with the understanding that you are to cancel Multiplex's contract and contract [Merit] under the same terms and conditions as Multiplex was contracted."

Any ambiguity in the term "joined forces" was eliminated by a March 22, 1978, letter to appellant from Robert Rosen, the president of Merit. "Milburn Fort has informed you that DU-RO, Multiplex and several other principals are merging. We are incorporating and the new Agency will be called [Merit]. Please have the enclosed appointment form completed and returned to my attention so I may take it with the other required forms directly to the Insurance Department. [¶] O. C. Dunham is now at the Millbrae address and all policies, checks, and correspondence are to come here. The contract is to be in the name of the new Corporation."

It was appellant's position at trial and in this appeal that the only rational conclusion to draw from these two letters was that Multiplex and the other constituents of Merit would cease to exist and that these former corporations would be merged into a new corporation, which would succeed to its predecessors' liabilities and assets including Multiplex's rights to the renewal commissions accruing on policies sold before the apparent merger.

In January of 1979, appellant loaned to Merit the sum of $42,500. Each of the shareholders of Merit, including Fort, personally guaranteed Merit's repayment of the loan. Merit however defaulted on the loan. On August 22, 1980, appellant sued Merit and the guarantors for the balance due on the loan. Merit filed a cross-complaint against appellant for breach of implied

covenant of good faith and fair dealing and interference with prospective business advantage. The litigation between appellant and Merit was ultimately settled in November of 1982. Under the terms of the settlement each side would release the other and take nothing. Appellant wrote off the remaining amount due on the loan to Merit after deducting the renewal commissions that are the subject of this appeal.

In the midst of the suit between appellant and Merit, Fort had his attorney send a letter to appellant demanding the renewal commissions owed to respondent. Appellant responded that it had the right to offset these renewal commissions against Merit's debt to appellant.

Six months after the settlement of the litigation between appellant and Merit, respondent brought suit against appellant claiming that appellant still owed it the renewal commissions.

While the law implies in every contract a covenant of good faith and fair dealing, it is not so clear when a breach of that covenant gives rise to an action in tort. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158].) The California Supreme Court in *Seaman's* noted that in holding "a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." (*Ibid.*) The court noted that no doubt there are other relationships with similar characteristics and deserving of similar legal treatment. (*Id.,* at p. 769.) The court stated in the past that it has "intimated that breach of the covenant of good faith and fair dealing in the employment relationship might give rise to tort remedies." (*Id.,* at p. 769, fn. 6.)

The court in *Seaman's* stated that "When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters." (*Id.,* at p. 769.) However, the court did say that when there is no special relationship, a breach of contract may still give rise to an action in tort if certain circumstances are present.

"It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made ' "without probable cause and with no belief in the existence of the cause of action." ' [Citation.] There is little difference, in principle, between a

contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. [Citation.] Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Id.,* at pp. 769-770.)[2]

The court in *Seaman's* did not find that the commercial transaction involved in that case necessarily gave rise to tort remedy, because the jury was improperly instructed and the jury was permitted to hold Standard liable if it found that Standard denied the existence of a valid contract, regardless of whether that denial was in good or bad faith. (*Id.,* at p. 770.) In *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 497, footnote 11 [220 Cal.Rptr. 818, 709 P.2d 837], the California Supreme Court again expressed its view that "that not every breach of the covenant of good faith and fair dealing in a commercial contract gives rise to an action in tort."

In *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], a laid-off furniture employee brought an action against his former employer for terminating monthly payments agreed to in return for plaintiff's noncompetition with the employer's business. At the time plaintiff was laid off he was 55 years old and was not eligible for his accrued pension benefits until he reached the age of 65. In April 1979, while plaintiff was still employed at Kroehler, he entered into a written agreement with the company which provided, among other things, that he was to receive $568.90 per month, beginning on July 1, 1979, until he turned 65. In return plaintiff agreed not to compete with defendant's business. Payments were made pursuant to this contract until June 1982. At this time plaintiff received a letter from the president of defendant stating that " 'the payments are not based on a legal obligation and we cannot, therefore, justify the continued payments of same.' " (*Id.,* at p. 1113.)

Plaintiff in *Wallis* responded to the termination of payments by filing a complaint against Kroehler and its president (hereafter collectively defendant). This complaint, as amended, contained four causes of action: (1) breach of contract; (2) bad faith breach of the implied covenant of good faith and fair dealing: (3) breach of fiduciary duty; and (4) intentional infliction of emotional distress. Plaintiff obtained a partial summary judgment in his

---

[2]The court stated that in these situations it is not necessary to predicate liability on the breach of an implied covenant. (*Id.,* at p. 769.)

favor on the breach of contract count. Defendant demurred to the remaining causes of action, and its demurrer was sustained without leave to amend as to the second and fourth causes of action and with leave to amend as to the third. Plaintiff petitioned the Court of Appeal for a writ of mandate to compel the trial court to vacate its order sustaining defendant's demurrer. The Court of Appeal issued a peremptory writ.

The court in *Wallis* held that under *Seaman's* plaintiff had stated a cause of action for tortious breach of contract. In so holding the court stated: "As noted earlier, the *Seaman* court intimated that a noninsurance contract could be tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract. [Citation.] For purposes of serving as predicates of tort liability, we find that the following 'similar characteristics' must be present in a contract: (1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." (*Id.,* at p. 1118.)

While *Wallis* is a pleading case, in *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551], the court upheld an award of $100,000 punitive damages because appellant's (UCB) breach of contract was also a tort. Since approximately 1972, respondents Commercial Cotton Company and its principal shareholder, Travis H. Calvin, had a commercial checking account at UCB. Calvin is a neurosurgeon practicing in El Centro, California, and since at least 1972 has been the sole signatory on that account which in prior years had been an active conduit for transactions relating to cotton ginning and cotton sales. In 1972 Calvin's wife reported the loss of a series of blank checks to UCB. One of the missing checks in the amount of $4,000 containing two unauthorized signatures was negligently honored by UCB in August of 1976. Respondents did not discover the loss until March 1978. UCB refused to reimburse respondents on the ground that the claim was barred by a one-year statute of limitations. When Calvin renewed his claim through his attorney on July 31, 1978, the bank's general counsel denied the claim by letter on the same ground. (*Id.,* at p. 514.) "However, on July 20, 11 days before the date of the general counsel's letter, the California Supreme Court, in a landmark decision directly involving UCB, expressly held these one-year statutory limitations

do not apply where a customer sues a bank for negligent conduct." (*Id.,* at p. 515.)

The court in *Commercial Cotton Co.* stated some of its considerations for allowing a punitive award for breach of a covenant of good faith and fair dealing in the following manner: "We find it inexplicable that UCB's general counsel could have been unaware of the Supreme Court holding affecting the bank for which he was general counsel at the time he wrote the July 31 letter. However, he later admitted these statutory bars were not applicable but, without stating reasons for his belief, still advised 'notwithstanding the foregoing decision [*Sun 'N Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 (148 Cal.Rptr. 329, 582 P.2d 920)] it is our opinion [Commercial Cotton] would be required to prove its case on the merits and we believe that the factual issues would be resolved in favor of United California Bank.' UCB's 'hard line' is unsupported by any reasonable analysis of the known facts." (*Id.,* at p. 515.)

UCB acknowledged the tort of breach of the covenant of good faith and fair dealing is not limited to insurance cases but claimed the special relationship that must exist before a tort action will arise did not exist in this case. The court in disagreeing with UCB and agreeing with respondent's position found that banking and insurance have much in common, stating: "both being highly regulated industries performing vital public services substantially affecting the public welfare. A depositor in a noninterest-bearing checking account, except for state or federal regulatory oversight, is totally dependent on the banking institution to which it entrusts deposited funds and depends on the bank's honesty and expertise to protect them. While banks do provide services for the depositor by way of monitoring deposits and withdrawals, they do so for the very commercial purpose of making money by using the deposited funds. The depositor allows the bank to use those funds in exchange for the convenience of not having to conduct transactions in cash and the concomitant security in having the bank safeguard them. The relationship of bank to depositor is at least quasi-fiduciary, and depositors reasonably expect a bank not to claim nonexistent legal defenses to avoid reimbursement when the bank negligently disburses the entrusted funds. Here, UCB's claimed defenses are spurious, and the jury found experienced legal counsel interposing them in an unjustifiable, stonewalling effort to prevent an innocent depositor from recovering money entrusted to and lost through the bank's own negligence, is a breach of the bank's covenant of good faith and fair dealing with its depositor. Viewing the evidence in a light most favorable to the verdict, we hold it is overwhelmingly supported by the evidence." (*Id.,* at p. 516.)

In the above-quoted portions of the opinion in *Commercial Cotton* the court first attempts to find a special relationship and then states that the UCB breached its covenant of good faith and fair dealing by asserting spurious defenses in an unjustifiable effort to stonewall the depositor's meritorious claim. It is clear that the court in *Commercial Cotton* found ample evidence to support a finding that UCB sought to avoid "all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 769-770.) Under such a situation it was unnecessary to find a special relationship, since *Seaman's* recognized that stonewalling "goes beyond the mere breach of contract. It offends accepted notions of business ethics. [Citation.] Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Seaman's, supra,* at p. 770.)

In *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877 [208 Cal.Rptr. 394], another court considered whether a breach of a covenant of good faith and fair dealing gave rise to an action in tort. In *Quigley,* an individual and his wholly-owned hauling corporation sued a corporation which had contracted with plaintiffs for the hauling of raw walnuts. Plaintiffs alleged a breach of contract, a breach of implied covenant of good faith and fair dealing arising out of the contract relationship, tortious interference with business relations and intentional infliction of emotional distress. The trial court instructed the jury that " '[i]f a contracting party fails to deal fairly and in good faith it is subject to liability for all damages proximately resulting from such conduct.' " (*Id.,* at p. 887.) The court in *Quigley* found the instruction was erroneous, stating: "In *Seaman's,* the plaintiff unsuccessfully sought a judicially declared rule that *whatever the contractual relationship,* a bad faith position taken by a contracting party exposes that person to tort liability, including punitive damages. That also is the essence of the instructions given on Quigley's request. We conclude the *Seaman's* majority hesitated to take that position for two reasons: (1) the facts made it unnecessary, and (2) the court was not ready to abandon special contractual relationships as distinguishing factors." (*Id.,* at p. 889, italics in original.)

The court in *Quigley* noted besides the tort liability for breach of a covenant of good faith and fair dealing on the ground some special relationship existed such as exist between insurer and insured, *Seaman's* described a new intentional tort, finding " 'it is not even necessary to predicate liability on a breach of the implied covenant.' The new tort: '[A] party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable

cause, that the contract exists.' (*Seaman's, supra,* at p. 769.) Under these circumstances, no special contractual relationship is required." (*Quigley, supra,* 162 Cal.App.3d at p. 890.)

The court in *Quigley* stated that the "judgment cannot be sustained by using a 'matter of law' approach." (*Quigley, supra,* 162 Cal.App.3d at p. 893.) The court stated that there was no special relationship which would provide an exception to the rule restricting relief to contract damages. "Quigley Bros. and Pet are commercial enterprises. Quigley is a corporate shareholder. There was no special relationship which removed the parties from usual commercial contract rules. At the inception of the contract the bargaining position of the parties was equal; Quigley willingly accepted the contract rate. [¶] The contractual relationship was entered into for the usual business reason of profit which can be assured by ordinary contract damages if a failure of performance occurred." (*Id.,* at p. 893.) The court further stated: "If there was an element of trust, it was mutual and not special. If there was an employment, it was between independent contractors and not personal." (*Ibid.*)

The court in *Quigley* reversed in part with the right to a new trial on the fourth cause of action, stating: "We cannot say that there was no evidence of an outright and unfounded denial of the existence of the contractual relationship. If properly instructed, a jury could conclude from the October 4 letter of the banker, and from the testimony of Quigley, that Pet's informing the bank there was never a contract was in bad faith. Pet would then be potentially liable for general and punitive damages." (*Id.,* at p. 894.)

Our task in the instant case is to determine whether, under the instructions given, a jury could determine that appellant was liable in tort for breach of a covenant of good faith and fair dealing because of special relationship or if the jury could find appellant liable for the new tort stated in *Seaman's.* We must also determine if the evidence in this case shows that as a matter of law no special relationship existed.

The trial court in the instant case instructed the jury as follows: "Plaintiff's second theory is that California Life Insurance Company breached the covenant of good faith and fair dealing implied by law in this contract. [¶] Under this theory, the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: [¶] One, the existence of a contract; [¶] Two, while the contract was in force and effect, California Life did not deal with the plaintiff fairly and in good faith and; [¶] Three, the nature and extent of the damages legally caused by that bad faith conduct. [¶] In connection with the second theory, that is, the

breach of implied covenant of good faith and fair dealing, the plaintiff seeks additional damages known as punitive damages. [¶] In order to be entitled to an award of punitive damages, the plaintiff has the burden of establishing by a preponderance of the evidence that the California Life Insurance Company acted with malice, fraud or oppression." Shortly thereafter, the trial court instructed the jury as follows regarding a covenant of good faith and fair dealing:

"I will now instruct you on the law relating to liability on the theory of the breach of the implied covenant of good faith and fair dealing.

"The law requires that every party to a contract act in good faith and deal fairly with the other party and not do anything which will deprive the other party of the benefits of the contract.

"The law requires that every party to a contract act in good faith and deal fairly with the other party.

"The question of what is, or is not, good faith and fair dealing between an insurance company and its general agent is for you to decide under all of the circumstances in this case, and in light of the evidence that has been presented.

"If under the Court's instructions, you find that plaintiff is entitled to a verdict against defendant under either of the plaintiff's legal theories, you must then award plaintiff damages. The amount of such award shall include the renewal commissions that the plaintiff earned, but were not paid.

"As I have instructed you previously, under the plaintiff's second theory of breach of the implied covenant of good faith and fair dealing, the plaintiff is seeking general and punitive damages.

"If you find that the plaintiff has established by a preponderance of the evidence that California Life did not deal with the plaintiff fairly and in good faith, as I have defined these terms in these instructions, then the plaintiff is entitled at least to general damages. The amount of general damages that the plaintiff is entitled to recover under the theory of the breach of the implied covenant of good faith and fair dealing is the same as the damages that the plaintiff is entitled to recover under the theory of breach of contract, and the instructions that I have just given you concerning the damages for breach of contract are applicable to the theory of breach of the implied covenant of good faith and fair dealing, as well.

"However, in addition to the general damages which you are to award the plaintiff, there is also the question of punitive damages.

"If you find that plaintiff suffered damages as a legal result of the breach of the implied covenant of good faith and fair dealing on which you based a finding of liability, you may then consider whether you should award punitive or exemplary damages against defendant for the sake of example and by way of punishment. You may in your discretion award such damages, if, but only if, you find by a preponderance of the evidence that said defendant was guilty of oppression, fraud or malice in the conduct on which you base your finding of liability.

"Malice means conduct which is intended by the defendant to cause injury to the plaintiff or carried on by the defendant with a conscious disregard for the rights or safety of others.

"Oppression means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

"Fraud means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of the property or legal rights or otherwise causing injury.

"The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice."

■ These instructions were clearly erroneous under the above discussed cases. As noted earlier, in *Seaman's* the plaintiff unsuccessfully sought a judicially declared rule that whatever the contractual relationship, a bad faith position taken by a contracting party exposes that person to tort liability. The jury was not instructed on what type of special relationship would justify upholding tort liability for a breach of a good faith and fair dealing covenant. Nor was the jury instructed on the new tort recognized in *Seaman's*. Since the jury was allowed to determine that tort liability had been established by a mere breach of a covenant of good faith and fair dealing, without determining if any special relationship existed between the parties or if the elements of the new tort established in *Seaman's* were present, the judgment in the instant case must be reversed.

■ Furthermore, as a matter of law, there is no special relationship which would provide an exception to the rule restricting relief to contract damages.

Appellant and respondent are commercial enterprises. The mere fact that Fort wished to live his retirement on renewal commissions does not create a special relationship which removed the parties from the usual commercial contract rules. Fort testified that he did not express his desire to get out of the insurance business until after respondent had made a contractual agreement with appellant. At the inception of the dealings between appellant and respondent, the bargaining positions of the parties were equal. The contractual relationship was entered into for the usual reason of profit; and under such circumstances contract damages, if a failure of performance occurred, are adequate. This case does not present a situation where breach of the covenant of good faith and fair dealing implied in every contract, also gives rise to a tort remedy as well as contract remedy on the ground that a special relationship existed.

The fact that respondent had to rely upon appellant to keep records on the insurance contracts which were renewed and the amount of renewal commissions due to respondent on each and every insurance contract, does not create a special relationship as respondent argued at oral argument, basing its position on *Commercial Cotton*. We have already determined that a finding that a special relationship existed in *Commercial Cotton* was unnecessary to the court's holding. Furthermore, in *Commercial Cotton* the court noted that while a bank provides a service for the depositor in a noninterest-bearing checking account by way of monitoring deposits and withdrawals, the bank does so for the commercial purpose of making money by using the deposited funds. The depositor allows the bank to use those funds in exchange for the convenience of not having to conduct transactions in cash. The court in *Commercial Cotton* stated that banking and insurance have much in common because both are highly regulated industries performing vital public services substantially affecting the public welfare. It cannot be said that appellant in keeping account of the amount of renewal commissions due respondent was performing a vital public service substantially affecting the public welfare. Furthermore, the depositor uses a checking account not only for the convenience of not having to conduct transactions in cash, but also for the purpose of having the bank safeguard the depositor's money.

Appellant did not keep records of the renewal contracts for any purpose other than meeting the terms of its contract with respondent. Respondent did not rely upon appellant to keep account of renewal commissions in order to safeguard its money. Respondent had to rely upon appellant to keep the accounts on the renewal commissions because appellant was the only entity with the necessary information to do so. Respondent's reliance upon appellant was for commercial reasons: to keep track of the money owed it. The

reliance of a depositor on a bank is not for commercial purposes of making money, although the bank offers checking accounts for commercial purposes. In the instant case the reliance is necessary because of the manner in which the parties conduct their businesses and both parties to the transaction have entered the contract to make money, whereas a person deposits funds in a noninterest-bearing checking account for a "nonprofit motivation." (*Wallis v. Superior Court, supra,* 160 Cal.App.3d 1109, 1118.)[3]

■ It is clear that the jury found that appellant breached its contract with respondent and therefore improperly set off the renewal commissions against the money owed appellant by Merit. There is no question that appellant denied any liability to respondent on account of the renewal commissions attributable to the policies obtained by respondent before its merger with Merit. Under *Seaman's* appellant might be liable for tort damages if appellant denied any liability "in bad faith and without probable cause, that the contract exists" or denied liability "without probable cause and with no belief in the existence of a defense [stonewalling]." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 769-770.) If a jury finds that such is the case, no special relationship is necessary. (*Ibid.*)

■ Appellant argues that it would be unconstitutional to apply tort law to this case, because when the conduct which is the basis of this suit occurred, tort liability was not recognized for such conduct. In *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147 [181 Cal.Rptr. 784, 642 P.2d 1305], the court held that the rule establishing that punitive damages are recoverable from an intoxicated driver who causes personal injuries is retroactively applicable to accidents that occurred and complaints that were filed prior to the judicial decision establishing such rule. In so holding the court stated "the increased liability is merely a change in the remedy for enforcing defendant's obligation to refrain from drunk driving, not a change in the nature of the obligation itself." (*Id.,* at p. 162.) The court also declared in *Peterson,* "California courts have routinely applied overruling decisions retroactively even though such decisions redefined the duty owed, thus the conduct prohibited." (*Id.,* at p. 161.)

Therefore, we reject appellant's argument that it would be unconstitutional to apply a tort remedy to the instant case, although no such remedy was recognized when the conduct occurred. *Seaman's* recognized that a tort

---

[3]We feel it is worthy of mention that Fort had no difficulty at arriving at the exact amount due respondent at the time of trial given the information supplied by appellant. Therefore, respondent did not need to rely upon appellant to arrive at the amount of renewal commissions due, but only some of the information appellant maintained on each policy.

remedy is proper in a commercial contract where a party in bad faith continually denies liability without any defense to a breach of contract claim. There is no question that in such a situation the party is subject to contract damages and holding that the party is also liable to tort damages is merely a change in remedy. Even if "stonewalling" is regarded as a new tort which "goes beyond the mere breach of contract," (*Seaman's, supra,* 36 Cal.3d at p. 770) such conduct has been regarded as improper before the facts giving rise to this suit occurred. (Cal.U.Com. Code, § 1102, subd. (3); *Seaman's, supra,* at p. 769, fn. 7.)

The judgment in favor of respondent in the amount of $9,377.71 is affirmed. The award of punitive damages is reversed with the right of a new trial on the basis of tort liability as set out in *Seaman's* and discussed herein. Each side shall bear its own costs on appeal.

Barry-Deal, J., and Merrill, J., concurred.

A petition for a rehearing was denied March 20, 1987, and respondent's petition for review by the Supreme Court was denied May 20, 1987.