**AIR–SEA FORWARDERS, INC.,**
**Plaintiff–Appellant,**

**v.**

**AIR ASIA COMPANY, LTD., and E–Systems, Inc., Defendants–Appellees.**

No. 86–6683.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1988.

Decided June 16, 1989.

As Amended Aug. 15, 1989.

Matthew S. Steinberg, and Drew E. Pomerance, Inman, Weisz & Steinberg, Beverly Hills, Cal., for plaintiff-appellant.

James R. Jurecka, Bishton & Jurecka, Los Angeles, Cal., for defendants-appellees.

Before GOODWIN and HALL, Circuit Judges, and BELLONI,* District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Plaintiff–Appellant Air–Sea Forwarders, Inc. (Air–Sea), appeals the judgment not withstanding the verdict (j.n.o.v.) entered in favor of defendants-appellees Air Asia Company, Ltd. (Air Asia), and E–Systems, Inc. (E–Systems), with respect to Air–Sea's claim of bad faith denial of the existence of a contract, and its separate claim for attorney's fees. The jury had returned a $6,000,000 verdict in appellant's favor on the bad faith claim. The district court also entered conditional new trial orders on these two claims. Air–Sea additionally seeks review of the order granting a new trial on its breach of contract claim and, if this court declines to reinstate the jury verdicts, of the grant of a directed verdict as to its unfair business practices claim.

We reverse the district court's entry of judgments n.o.v. on the bad faith denial of existence of contract claim and the attorney's fees claim. However, we affirm the district court's conditional order for new trials on both these claims. Finally, we are without jurisdiction to review the district court's new trial order on the breach of contract claim, or its directed

---

* Honorable Robert C. Belloni, United States District Judge for the District of Oregon, sitting by designation.

verdict on the unfair business practices claim.[1]

## I

Appellant is an international freight forwarder and licensed customshouse broker that is wholly owned by its president, Erwin Rautenberg.[2] Appellee Air Asia is a subsidiary of Appellee E–Systems, a defense contractor. Until its acquisition by E–Systems in 1975, Air Asia had been owned secretly by the Central Intelligence Agency (CIA). Air Asia operated an aircraft repair and maintenance facility in Taiwan, primarily to support the CIA's secret Southeast Asian air force, Air America.

Air–Sea began working as Air Asia's international freight forwarder and customshouse broker in 1950. Air Asia purchased goods and materials to support its Taiwanese operations through its office in Burbank, California. Air–Sea facilitated the export of Air Asia's goods to Taiwan, as well as the import of certain goods into the United States. In the interests of secrecy, however, Air Asia itself packed the goods destined for Taiwan. Air–Sea was not aware of Air Asia's CIA ownership.

Air Asia became concerned about the desire of California taxing authorities to levy the state's sales and use taxes on the value of goods passing through Air Asia's Burbank facility. As an agency of the United States, Air Asia was not subject to state taxation. Air Asia, however, did not want to reveal its true ownership just to avoid state taxation. In 1955, an opportunity arose for Air Asia to avoid California taxation without disclosing its true ownership; section 6387 was added to the California Revenue and Taxation Code.[3] For the first time, this section exempted from taxation goods purchased for use solely outside the state and delivered to an independent export packer. Thus, if an independent packer did Air Asia's packing, Air Asia would qualify for the section 6387 exemption.

In 1956, Air Asia approached Rautenberg with a proposal that Air Asia use Air–Sea as an independent export packer. Air–Sea had no experience with export packing, but Air Asia officials revealed to Rautenberg the CIA's role and requested his assistance. Pursuant to this ruse, Air Asia entered into a written packing agreement with Air–Sea in January 1957, obligating Air Asia to pay Air–Sea $230 a month for packing services. Air Asia and Air–Sea also entered into a written tenancy agreement, requiring Air–Sea to pay Air Asia $400 per month in rent for space in Air Asia's Burbank facilities. Air Asia's Burbank packing employees were transferred to Air–Sea's payroll and paid with Air–Sea checks. Air–Sea also assumed Air Asia's collective bargaining

---

**1.** On December 2, 1986, the district court entered judgments on the bad faith and attorney's fees claims pursuant to Fed.R.Civ.P. 54(b). The district court's Rule 54(b) order was a prerequisite to our jurisdiction because the district court has not entered a final judgment on the breach of contract claim, which it has set for a new trial. The district court, however, found that there was no just reason to delay an appeal. We review this finding for an abuse of discretion. *See Sheehan v. Atlanta Intern. Ins. Co.*, 812 F.2d 465, 468 (9th Cir.1987). In *Sheehan*, the court held that a remaining counterclaim did not undermine the reasonableness of an immediate appeal. "The Rule 54(b) claims do not have to be separate from and independent of the remaining claims." *Id.* The district court did not abuse its discretion in entering its Rule 54(b) order. Thus, we have jurisdiction over the j.n.o.v. on the bad faith claim and the attorney's fees claim. Derivatively, we have jurisdiction over the district court's new trial orders on these claims. *See infra* note 15. The district court, however, did not include in its Rule 54(b) order the new trial order on the breach of contract claim or the directed verdict on the business practices claim. Accordingly, we are without appellate jurisdiction over these claims. *See Sheehan*, 812 F.2d at 468; *see also* note 17, *infra*.

**2.** We construe the evidence in the light most favorable to Air–Sea in evaluating the district court's entry of a j.n.o.v. *See Fleming v. Dept. of Pub. Safety*, 837 F.2d 401, 408 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988).

**3.** Section 6387 provides an exemption from sales and use taxes for goods "purchased for use solely outside this State and delivered to a forwarding agent, export packer, or other person engaged in the business of preparing goods for export or arranging for their exportation...." Cal.Rev. & Tax. § 6387.

agreement with the Teamsters Union covering the packing employees.

In reality, Air Asia continued to do its own export packing. Air Asia's office manager in Burbank, Roy Herold, continued to supervise "Air–Sea's" packing employees. Air Asia created a bank account in Air–Sea's name through which it funded all expenses arising from the packing operation, including salaries and rent. Air Asia's bookkeepers signed checks on this bank account using their maiden names, and Air–Sea never deposited any of its own money into the account. In effect, Air Asia paid rent to itself and salaries to its own employees.

Rautenberg testified that he sought and obtained certain oral assurances from Air Asia in exchange for Air–Sea's participation in the packing sham. Most significantly, Air–Sea was to act as Air Asia's exclusive freight forwarder and customshouse broker and was not to be terminated without good cause. Rautenberg testified that this promise gave Air–Sea the incentive to participate in the packing scheme. He also testified that Air Asia promised to hold Air–Sea harmless for all expenses and liabilities arising from the packing arrangement, including attorney's fees incurred in enforcing the oral agreement.

While the parties had entered into certain written agreements in connection with the packing operation, no written agreement governed Air–Sea's supply of forwarding and brokering services. On August 1, 1966, the parties executed a written agreement purporting to govern Air–Sea's forwarding and brokering services. This agreement described the services Air–Sea was to perform and the rates it was to be paid. The agreement was renewable on an annual basis unless either party gave written notice of termination 30 days prior to the anniversary date. Finally, the agreement specified that it was the entire and only agreement between the parties.

Rautenberg had requested that the agreement contain a provision allowing termination only for good cause, but the final written agreement did not require good cause. Nonetheless, Rautenberg testified

that Air Asia's president, Hugh Grundy, Burbank manager Herold, and others, repeatedly assured him that the 1966 written agreement would not supersede the 1956 oral agreement, especially the clause requiring good cause for termination.

On July 27, 1981, Air Asia notified Air–Sea that it had selected another freight forwarder and that Air–Sea's services were terminated effective August 27, 1981. Rautenberg sent Air Asia a telex on August 3, 1981, protesting the notice of termination for failing to be 30 days prior to the August 1, 1981, anniversary date. Rautenberg stated that the 1966 written agreement's termination provisions were "very much in effect."

## II

Air–Sea filed this action on August 12, 1981, alleging that Air Asia had failed to provide notice of termination 30 days prior to August 1, 1981, as required by the 1966 written agreement. On May 5, 1982, Air–Sea filed a first amended complaint that alleged for the first time that the parties had a prior oral agreement requiring good cause for termination. It subsequently filed a second amended complaint upon which the case was tried.

The district court bifurcated the liability and damages phases of trial. On April 22, 1986, following the liability trial, the jury returned special verdicts. The jury found that the parties had entered into an oral agreement in 1956, which Air Asia violated in 1981 by terminating Air–Sea without just cause. The jury also concluded, however, that the 1966 agreement was intended to be a valid agreement constituting the only and entire agreement between the parties respecting freight forwarding and customshouse brokering services.

The district court entered an order on May 8, 1986, finding the jury's special verdict inconsistent and entering a j.n.o.v. on the breach of contract claim. The court found that the jury was mistaken as to the legal effect of the 1966 agreement and that the 1956 agreement was superseded as a matter of law. The court also stated that

it would entertain a motion by Air Asia for the entry of j.n.o.v. on the bad faith claim and the attorney's fees claim.

Air–Sea immediately sought a writ of mandamus. On June 16, 1986, this court ordered the district judge to reconvene the jury to clarify the ambiguity in its special verdict. The jury then reversed two of its earlier verdicts, finding that the 1966 agreement *was* invalid and *not* intended to be the entire agreement of the parties.

Trial then proceeded on damages, and the jury returned verdicts for plaintiff of $6,000,000 in punitive damages on the claim for bad faith denial of contract, and $216,151.50 in compensatory damages for the underlying breach of contract.

Appellees filed a motion for a j.n.o.v., or in the alternative, a new trial, on all counts. On October 29, 1986, the district court granted appellees' motion for j.n.o.v. on the bad faith claim and the attorney's fees claim. The court also granted a new trial on the breach of contract claim.

## III

This court reviews a j.n.o.v. under the same standard as applied by the district court. "J.n.o.v. is proper if the evidence construed in the light most favorable to the nonmoving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's; it is improper if reasonable minds could differ over the verdict." *Fleming v. Dept. of Pub. Safety*, 837 F.2d 401, 408 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988).

### A

The district court concluded that it had made a "mistake" in submitting the bad faith claim to the jury. The court's order acknowledged that the leading case of *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of Cal.*, 36 Cal.3d 752, 686 P.2d 1158, 206 Cal.Rptr. 354 (1984), establishes liability for the bad faith denial of the existence of a contract under California law. But the court found that a decision following the *Seaman's* case, *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984), narrowed this tort and made it inapplicable to this case as a matter of law. The district court ruled that pursuant to the *Wallis* decision, Air Asia was not liable for its denial of the existence of the 1956 contract because the parties did not share a special relationship.

In addition, the district court found that there was "no evidence" that appellees' "alleged" denial of the just-cause covenant was in bad faith, and that the only instance of such denial was in defendants' answer to the first amended complaint, a "privileged assertion." Finally, the court emphasized that appellees at most denied the existence of the terms of the oral agreement, not "the existence of an oral arrangement as such."

Air–Sea contests the district court's entry of the j.n.o.v. on the bad faith claim on both procedural and substantive grounds. Air–Sea first asserts that Federal Rule of Civil Procedure 51 prohibited the j.n.o.v. because appellee failed to preserve any alleged error by not objecting to the relevant jury instruction. Second, Air–Sea disputes the merits of the district court's order.

### 1

We first consider whether there is a procedural obstacle to the district court's reliance on the *Wallis* decision. Air–Sea strenuously asserts that Rule 51 prohibits the j.n.o.v. in favor of appellees because Air Asia did not object to the jury instructions on the bad faith claim. Neither did Air Asia request a jury instruction stating that liability for the bad faith denial of the existence of contract under California law is appropriate only where the parties have a special relationship. But Air Asia responds that Rule 51 is inapplicable to an appeal from a ruling on a motion for j.n.o.v.

### a

Rule 51 provides in part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to

which he objects and the grounds of his objection."

At the charge conference the day before closing argument, the district court stated:

Seaman's clearly says that if you have a bad faith denial of a valid contract, you have a tort cause of action.... You're dead right on the principle, and I don't think there's any question about that.... And quite simply, a party who takes the position, in bad faith, that a valid contract doesn't exist, can be liable in tort ... you know what I'm talking about. (omitting colloquy with attorneys).

Air Asia did not submit a proposed jury instruction on plaintiff's bad faith denial of existence of contract claim, nor did they specifically object to the jury instruction that the court gave.[4] Consequently, if Rule 51 governs a j.n.o.v., appellants correctly identify error below.

b

The Supreme Court recently[5] has concluded, however, that a party's failure to object to relevant jury instructions does not prevent it from challenging the sufficiency of the evidence on a legal basis different from that contained in the instructions.[6]

4. On the morning of April 16, 1986, just before defense counsel concluded his closing argument, the court heard from the parties on their objections to the jury instructions. Plaintiff's counsel specifically sought to "make a record" on several instructions that the court declined to give. Defense counsel, however, voiced only one objection with regard to the implied contract instruction.

5. The Court arguably addressed this issue first in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In *Aspen*, the jury found that the defendant had monopolized the market for downhill skiing services in Aspen, Colorado, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. The district court denied defendant's motion for j.n.o.v. Plaintiff contended that defendant had not properly preserved for appeal its argument that it did not misuse its monopoly power, but the Supreme Court disagreed, stating that "we agree with the Court of Appeals' conclusion, 738 F.2d [1509] at 1517–1518 [ (10th Cir.1984) ], that [defendant's] motion for a directed verdict did raise the question whether the judgment improperly rested on an assumption that § 2 required a monopolist to cooperate with its rivals." *Aspen Skiing*, 472 U.S. at 600 n. 26, 105 S.Ct. at 2856 n. 26.

The court of appeals had rejected plaintiff's assertion that defendant's failure to object to the jury instruction on monopolization precluded defendant from challenging "the sufficiency of the evidence under legal principles different from those announced in the instructions." 738 F.2d at 1517. The court found that defendant's two motions for directed verdict "preserved defendant's opportunity to challenge the sufficiency of the evidence on that issue under the truly controlling law, regardless of defendant's failure to object to the jury instructions concerning a duty to cooperate." *Id.*

The court of appeals in *Aspen Skiing* relied on precedent first established by a decision of the Eighth Circuit, *Coca Cola Bottling Co. of Black Hills v. Hubbard*, 203 F.2d 859 (8th Cir.1953). This circuit has never cited the *Coca Cola* decision as precedent. That court's reasoning merits reproduction in full.

It is true, of course, that appellant may not challenge on review the correctness of instructions to which he took no exceptions or only a general exception. Rule 51 of the Federal Rules of Civil Procedure. In that sense, and in that sense only, it may be said that the instructions to which no exceptions are taken become law of the case for determining whether the instructions are subject to appeal. But in determining whether a trial court has erred in denying a motion for directed verdict at the close of the evidence, it is the applicable law which is controlling, and not what the trial court announces the law to be in his instructions. This Court must ascertain for itself what the applicable law is, whether the instructions were excepted to or not. A proper motion for a directed verdict and its denial will always preserve for review the question whether under the law truly applicable to the case there was an adequate evidentiary basis for the submission of the case to the jury.

*Id.* at 862 (citations omitted).

The treatises have relied upon the *Coca Cola* decision to form general propositions about preservation of error through a motion for directed verdict. *Federal Practice, supra*, § 2558, at 670–71 ("Many decisions say that an instruction not objected to becomes the law of the case. This may be merely one way of phrasing the general principle that failure to object ordinarily bars later challenge to an instruction. It appears to have no meaning beyond that.") (citing *Coca Cola*); 1 B Moore's Federal Practice ¶ 0.404[9], at 166–67 (instructions to which no exception is taken "are not the law of the case for reviewing an order denying a motion for the direction of a verdict.") (quoting *Coca Cola*).

6. Two Ninth Circuit decisions, however, are arguably incompatible with this reasoning. Accordingly, we must reject them to the extent they are inconsistent with recent Supreme Court precedent. In *Reed v. AMF Western Tool, Inc.*,

"[T]he failure to object to an instruction does not render the instruction 'law of the case' for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988) (plurality opinion) (quoting dissent in *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 107 S.Ct. 1114, 1118, 94 L.Ed.2d 293 (1987)).[7] In *Praprotnik*, the defendant city did not object to a jury instruction that the city was liable under section 1983 for the actions of one "high enough in the government so that his or her actions can be said to represent a government decision." *Id.* 108 S.Ct. at 921. But the city had filed a pretrial motion for summary judgment and a motion for j.n.o.v. that argued the plaintiff had failed to establish the existence of an impermissible municipal policy. *Id.* at 922. The Court found these motions sufficient to preserve the municipal policy issue for appeal, "[a]lthough the same legal issue was raised by both those motions and the jury instruction." *Id.*

The *Praprotnik* Court emphasized that "the focus of [the city's] challenge is not on the jury instruction itself, but on the denial of its motions for summary judgment and a directed verdict." *Id.* at 922. Rule 51 applies only to a party's attempt to "assign as error the giving or the failure to give an instruction." Where a party contests on appeal the district court's ruling on a motion for directed verdict, however, the party's assignment of error is the ruling on the motion for directed verdict, not the subsequent jury instruction.[8] This is just another way of saying that the motion for directed verdict, although sometimes overlapping with the points of law reflected in the jury instructions, is distinct.[9] The inquiry, therefore, focuses on the propriety of granting the motion for directed verdict, which depends upon the sufficiency of the evidence up to that point in the trial; the jury instructions on the points of law contained in the motion for directed verdict are simply outside the scope of that analysis. Accordingly, Rule 51 does not impede appellees' ability to defend the district court's reliance on the *Wallis* decision.[10]

431 F.2d 345 (9th Cir.1970), the jury awarded plaintiffs damages as a result of personal injuries caused by a "runaway" snowmobile manufactured by the defendant. Following the jury's verdict, the defendant moved for judgment in accord with its prior motion for directed verdict, or in the alternative for a new trial. *Id.* at 347. Reviewing the district court's order rejecting defendant's motion for j.n.o.v., the *Reed* court concluded that the defendant's privity and disclaimer defenses were raised improperly for the first time in the post-trial motions. "However, defendants did not raise the above claimed defenses by objecting to the instructions ... before the case was submitted to the jury." *Id.* at 349 n. 2. Based upon this asserted error, the court found that it "was clearly too late to preserve these defenses for this appeal." *Id.*

In *Pierce v. Southern Pac. Transp. Co.*, 823 F.2d 1366, 1371 (9th Cir.1987), the court also rejected a defendant's argument that the district court improperly had denied its motion for j.n.o.v. following a jury verdict in the plaintiff's favor. As the defendant had failed to preserve its objection to the jury instructions, the court declined to reverse the district court's denial of a j.n.o.v.

7. While *Praprotnik* is a plurality opinion, a majority of the Court recently relied upon it to reject a plaintiff's argument that the defendant's failure to object to a jury instruction prevented

the defendant from challenging the sufficiency of the evidence upon a legal theory different from that outlined in the instructions. *See Boyle v. United Technologies Corp.*, —— U.S. ——, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988).

8. If a party fails to appeal the district court's j.n.o.v. ruling and specifically limits its appeal to error with regard to a particular jury instruction, however, then the *Praprotnik* doctrine would be inapplicable.

9. While the motion for j.n.o.v. follows the jury's verdict, it must be preceded by a motion for directed verdict at the close of all the evidence. *See* Fed.R.Civ.P. 50(b); *Federal Practice, supra,* ¶ 2537, at 598.

10. Appellant cites the recent decision of the California Court of Appeal, *Null v. City of Los Angeles*, 206 Cal.App.3d 1528, 254 Cal.Rptr. 492 (1988). In *Null*, the court held that "where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury." *Id.* 254 Cal.Rptr. at 496. Federal Rules of Civil Procedure 50 and 51 establish the proper grounds for the entry of a directed verdict and the consequences of failing to object to a jury instruction. "Review of

### 2

This court now must determine whether reasonable minds could differ over appellant's bad faith denial of the existence of contract claim. The district court found that Air–Sea and Air Asia lacked the special relationship necessary to justify liability for that claim under *Seaman's.* Air–Sea argues on appeal that the district court erred in holding that liability under *Seaman's* is limited to special relationships, and that bad faith damages are available in an ordinary commercial contract setting. Air–Sea does not argue that it had a special relationship with Air Asia.

### a

In *Seaman's,* the court framed the issue in the first paragraph of its opinion: "May a plaintiff recover in tort for breach of an implied covenant of good faith and fair dealing in a noninsurance, commercial contract." 686 P.2d at 1160, 206 Cal.Rptr. at 356. The plaintiff in *Seaman's* supplied general contractor services to vessels from its waterfront facility. The plaintiff alleged that it had a contract with Standard Oil of California to operate a marine fuel dealership, which Standard breached by cancelling new dealerships during the 1973 oil embargo. *Id.* at 1160–61, 206 Cal.Rptr. 356–57. The *Seaman's* court held that "a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." *Id.* at 1167, 206 Cal.Rptr. at 363.

The *Seaman's* opinion, however, is ambiguous as to the origin of this holding.[11] The court stated that tort damages historically were available for the breach of the implied covenant of good faith and fair dealing only where the contracting parties shared a special relationship. *Id.* 686 P.2d at 1168, 206 Cal.Rptr. at 362. Furthermore, the court noted the need to proceed with caution concerning the expansion of bad faith damages in ordinary commercial settings. *Id.* at 1168, 206 Cal.Rptr. at 363. Nonetheless, the court stated that its holding was not predicated on the breach of the implied covenant of good faith and fair dealing, and that "[f]or the purposes of this case it is unnecessary to decide the broad question" whether the bad faith breach of the implied covenant required a special relationship. *Id.*

The *Wallis* decision came six weeks after the *Seaman's* case. In *Wallis,* the plaintiff alleged that his employer had agreed to make certain periodic payments to him following his termination as a 30–year employee of a furniture manufacturing plant. 207 Cal.Rptr. at 127. The plaintiff alleged that the employer had breached the implied covenant of good faith and fair dealing by stopping the payments and lying about the reason for doing so. The Court of Appeal, Fourth District, stated that liability for the bad faith breach of contract was restricted to situations where the parties shared "similar characteristics" to the insurer-insured relationship. 207 Cal.Rptr. at 129. But the court found that the employer-employee relationship satisfied this standard.

whether there is sufficient evidence to support the finding of fraud is, however, a procedural matter in which we must apply federal law." *The Glovatorium, Inc. v. NCR Corp.,* 684 F.2d 658, 660 (9th Cir.1982).

Where a federal rule is precisely contrary to state practice, a federal court sitting in diversity must apply the federal rule where it regulates "judicial process for enforcing rights and duties recognized by substantive law." *Olympic Sports Prods. v. Universal Athletic Sales,* 760 F.2d 910, 914 (9th Cir.1985) (quoting *Sibbach v. Wilson & Co.,* 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941), *cert. denied,* 474 U.S. 1060, 106 S.Ct. 804, 88 L.Ed.2d 780 (1986)); *see also Hanna v. Plumer,* 380 U.S. 460, 463–64, 85 S.Ct. 1136, 1139–40, 14 L.Ed.2d 8 (1965); *Benny v. Pipes,*

799 F.2d 489, 493 (9th Cir.1986), *amended,* 807 F.2d 1514 (9th Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). Accordingly, we do not find the *Null* decision controlling.

11. Indeed, the *Seaman's* court's failure to explain *why* it was not necessary to predicate its holding on the implied covenant of good faith and fair dealing, or to *justify* the dramatically greater liability for the bad faith denial of the existence of a contract as compared to the bad faith dispute of a contract's terms, undoubtedly spawned the confusion in the appellate division cases discussed *infra. See Oki America, Inc. v. Microtech Intern., Inc.,* 872 F.2d 312, 314–17 (9th Cir.1989) (Kozinski, J., concurring).

The plaintiff in *Wallis* did not allege that the defendant had denied the *existence* of a contract altogether, the type of claim raised in *Seaman's*. Rather, the plaintiff only alleged that the defendant had breached the implied covenant of good faith and fair dealing by disputing the *terms* of the contract in bad faith. This terms-existence distinction is critical, however, because the *Seaman's* court expressly declined to base its holding on the breach of the implied covenant of good faith and fair dealing, which traditionally was limited to special relationships. Consequently, the *Wallis* decision's holding that disputing the terms of a contract in bad faith was actionable only given a special relationship between the parties to the contract in no way indicated that a special relationship was also necessary for the bad faith denial of the existence of a contract.

Nonetheless, the district court below interpreted the *Wallis* decision to confine tort liability for the bad faith denial of the existence of a contract under *Seaman's* to cases in which a special relationship of a quasi-fiduciary nature exists among the parties to the contract. Subsequent decisions of the California courts, however, have described *Seaman's* as recognizing a new tort for the denial of the existence of a contract in bad faith that does not require a special relationship between the parties. Yet, the district court's interpretation of the *Seaman's* case ultimately was vindicated by a recent California appellate court decision. The California appellate courts now are divided over whether bad faith damages are available for the bad faith denial of the existence of a contract in ordinary commercial contracts. *Compare Martin v. U–Haul Co. of Fresno*, 204 Cal. App.3d 396, 251 Cal.Rptr. 17 (5th Dist.1988) (rejecting a special relationship prerequisite for the bad faith denial of the existence of a contract); *Multiplex Ins. Agency, Inc. v. California Life Ins. Co.*, 189 Cal.App.3d 925, 934–35, 938–40, 235 Cal.Rptr. 12, 17–18, 20–21 (1st Dist.1987) (same); *and Quigley v. Pet, Inc.*, 162 Cal.App.3d 877, 890, 892–94 & n. 7, 208 Cal.Rptr. 394, 401, 403–04 & n. 7 (5th Dist.1984) (same); *with Okun v. Morton*, 203 Cal.App.3d 805, 250 Cal.Rptr. 220, 231–233 (2d Dist.1988) (requiring special relationship for bad faith denial of the existence of contract).

b

The plaintiff in the *Quigley* case, a trucking company, alleged that the defendant improperly had denied the existence of a contract to haul raw walnuts. 208 Cal. Rptr. at 395. The case was tried before the *Seaman's* decision was rendered, however, so the *Quigley* court was left to sort out the meaning of that recent case. The *Quigley* court reversed the jury's verdict on the implied covenant of good faith and fair dealing claim, finding that "[t]here was no admitted special relationship which would provide an exception to the rule restricting relief to contract damages." *Id.* at 403.

Yet, the *Quigley* court remanded the case for a new trial. The court stated that there was "evidence of an outright and unfounded denial of the existence of the contractual relationship." *Id.* at 404. The court interpreted the *Seaman's* case as having created a "new intentional tort" that was not dependent on a special relationship. *Id.* at 401. It stated that the *Seaman's* case did not raise questions about the defendant's *performance* of the contract, *id.*, but only "[t]he unfounded protest of *any* contract term," *id.* at 402.

The *Multiplex* case addressed both the breach of the implied covenant of good faith and fair dealing and the "new tort" recognized in *Seaman's* for the bad faith denial of the existence of a contract. 235 Cal.Rptr. at 20. The *Multiplex* court conceded that a bad faith dispute over the terms of a contract in violation of the implied covenant of good faith and fair dealing was not actionable absent a special relationship between the parties. *Id.* As the trial court had instructed the jury only on the implied covenant claim and did not emphasize the need for a special relationship, the jury's verdict could not stand. But the *Multiplex* court also held that the "new tort" for the denial of the existence of a contract did not require a special relationship. Accordingly, the *Multiplex* court

remanded the case for a new trial on both the implied covenant claim and denial of existence of a contract claim. *Id.* at 21.

The *Okun* court conceded that the *Multiplex* and *Quigley* cases interpreted *Seaman's* as creating a new tort distinct from the implied covenant, but rejected them, holding "that denial of the existence of a contract in bad faith and without probable cause falls squarely within the realm of the covenant of good faith and fair dealing." *Okun*, 250 Cal.Rptr. at 232. As a mere subset of the implied covenant, the *Okun* court reasoned that the denial of the existence of a contract is necessarily limited "to those situations involving a 'special relationship.'" *Id.* at 233.

c

■ In a diversity case, "[w]here the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir.1986), *modified*, 810 F.2d 1517 (9th Cir.1987). The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis. *See id.; Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 735 (9th Cir.1986); *Tenneco West, Inc. v. Marathon Oil Co.*, 756 F.2d 769, 771 (9th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 111 (1985). But where the state's intermediate appellate courts have reached conflicting results, the federal court must ascertain for itself the most authoritative assessment of state law. *See Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir.1982). "Federal courts are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy." *Paul v. Watchtower Bible & Tract Soc. of New York*, 819 F.2d 875, 879 (9th Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).[12]

d

■ In considering "all available data," *see Estrella*, 682 F.2d at 817, this court takes particular note of the recent decisions of the California Supreme Court that have narrowed the scope of tort liability. In *Moradi–Shalal v. Fireman's Fund Ins.*, 46 Cal.3d 287, 758 P.2d 58, 250 Cal.Rptr. 116 (1988), the court, overruling previous precedent, held that a statute prohibiting insurance companies from engaging in unfair practices did not create a private cause of action in favor of either the insured or third-party claimants. In *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 765 P.2d 373, 254 Cal.Rptr. 211 (1988), the court, overruling dicta in *Seaman's* and numerous appellate cases, held that bad faith tort damages are not recoverable for the breach of the implied covenant of good faith and fair dealing in an employment contract. Most recently, in *Thing v. La Chusa*, 48 Cal.3d 644, 771 P.2d 814, 257 Cal.Rptr. 865 (1989), the court, again overruling precedent, held that a plaintiff may recover for emotional distress caused by viewing the negligently inflicted injury of a third person only if the plaintiff is closely related to the victim and is present at the scene of the injury at the time it occurs and is aware of the accident.

The *Foley* case is of particular interest, because the court analyzed the implied cov-

---

**12.** The need for a special relationship as a predicate for a claim of bad faith denial of the existence of contract is an open issue in this circuit. The cases that have discussed *Seaman's* generally did so in the context of claims for the bad faith breach of a contract's terms. *See, e.g., Premier Wine & Spirits v. E. & J. Gallo Winery*, 846 F.2d 537, 540 (9th Cir.1988); *May v. Watt*, 822 F.2d 896, 899 (9th Cir.1987); *Miller*, 797 F.2d at 735–36. These cases uniformly require some sort of special relationship.

The court in *Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1199 (9th Cir.1986), did consider a claim for the bad faith denial of the existence of a contract. The plaintiff had prevailed on summary judgment on his claim that the defendant had denied in bad faith the existence of an implied-in-fact contract. The only issue addressed on appeal was whether *Seaman's* damages were available for the bad faith denial of existence of an implied-in-fact contract. The court concluded that bad faith damages were appropriate, but did not discuss the need for a special relationship.

enant of good faith and fair dealing. The court rejected numerous cases of the courts of appeal that had held employment was a "special relationship" permitting bad faith damages. *See Foley*, 765 P.2d at 392–93, 395 n. 29, 254 Cal.Rptr. at 230–31, 233 n. 29. In overruling these cases, the *Foley* court dramatically curtailed the expansion of bad faith liability beyond the traditional insurer-insured relationship.

Significantly, many of the appellate decisions rejected in *Foley* had seized upon the following language from the *Seaman's* case: "No doubt there are other relationships with similar characteristics and deserving of similar legal treatment." *Seaman's*, 686 P.2d at 1166, 206 Cal.Rptr. at 362. Indeed, the *Seaman's* court specifically had stated that the employment relationship "has some of the same characteristics as the relationship between insurer and insured." *Id.* at 1166 n. 6, 206 Cal.Rptr. at 362 n. 6. The *Foley* court criticized the lower court decisions for uncritically relying upon this "dicta" in *Seaman's*.

The *Foley* court's narrow view of the special relationship justifying bad faith damages was founded upon a comprehensive analysis of the role of tort liability in contractual settings. The court identified these two key factors:

> First, predictability about the cost of contractual relationships plays an important role in our commercial system.... Moreover, "Courts traditionally have awarded damages for breach of contract to compensate the aggrieved party rather than to punish the breaching party."

*Id.* 765 P.2d at 389, 254 Cal.Rptr. at 227 (omitting citations). Applying these considerations, the court concluded that finding the employment contract to be a special relationship would conflict with "countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees." *Id.* at 396, 254 Cal.Rptr. at 234.

The court's *Moradi* decision expressed similar concerns, noting that previous precedent has "resulted in multiple litiga-tion or coerced settlements, and has generated confusion and uncertainty regarding its application." *Moradi*, 758 P.2d at 68, 250 Cal.Rptr. at 126. This desire for predictability was also at the root of the *Thing* decision, where the court stated that "drawing arbitrary lines is unavoidable if we are to limit liability and establish meaningful rules for application by litigants and lower courts." *Thing*, 48 Cal.3d at 828, 771 P.2d 814, 257 Cal.Rptr. 865.

e

While the California Supreme Court's recent decisions have narrowed the scope of tort liability in general, and the availability of bad faith breach damages in particular, we cannot agree with the *Okun* court that a special relationship is necessary to establish liability for the bad faith denial of the existence of contract. Most significantly, we note that the recent *Foley* case undermines the rationale for the *Okun* court's conclusion; the California Supreme Court decision solidly reaffirms the notion that the bad faith denial of the existence of contract is a cause of action wholly distinct from the breach of the covenant of good faith and fair dealing. The *Okun* court, however, rejected the cases that characterize *Seaman's* as creating a new tort, and instead concluded "that denial of the existence of a contract in bad faith and without probable cause falls squarely within the realm of the covenant of good faith and fair dealing." *Okun*, 250 Cal.Rptr. at 233.

The *Foley* court criticized the lower court decision in *Koehrer v. Superior Court*, 181 Cal.App.3d 1155, 226 Cal.Rptr. 820 (1986), for improperly "extend[ing] the *expressly circumscribed cause of action established in Seaman's based on denial of the existence of the contract*, to find a tort cause of action when the dispute related to a contract term, namely the necessity for good cause as a basis for termination." *Foley*, 765 P.2d at 393, 254 Cal.Rptr. at 231 (emphasis added). Furthermore, the *Foley* court, again criticizing the *Koehrer* decision, stated that the court of appeal had "acknowledged that we found it unnecessary to base our decision in *Seaman's* on

the implied covenant of good faith and fair dealing, but nonetheless concluded that we essentially had done so." *Id.*

The *Okun* court's conclusion that a special relationship is needed *because* the bad faith denial of the existence of a contract is a subset of the implied covenant is patently incompatible with the *Foley* court's subsequent declaration that the *Seaman's* court did not base its decision on the implied covenant. In addition, the *Okun* court minimized the distinction between the bad faith denial of the existence of a contract and the bad faith dispute of a contract's terms. *Okun*, 250 Cal.Rptr. at 232. The *Foley* court, however, emphasized the difference between these two claims, *see Foley*, 765 P.2d at 393, 254 Cal.Rptr. at 231, and also noted the fundamental difference between claims arising "ex delicto" and "ex contractu," *see id.* at 394, 254 Cal.Rptr. at 232.

Finally, we cannot escape the *Seaman's* case itself. The *Seaman's* court noted the danger in permitting a bad faith cause of action in ordinary commercial contracts. Nonetheless, the court held that it would be appropriate to instruct the jury that the defendant was liable for the bad faith denial of the existence of a contract. *Seaman's*, 686 P.2d at 1167, 206 Cal.Rptr. at 363. The court found it "unnecessary" to decide whether the bad faith breach of the covenant was limited to special relationships, because the denial of the existence of a contract was not predicated on the implied covenant. *Id.* Given the commercial contract at issue in *Seaman's*, the defendant could not possibly have been liable were a special relationship a prerequisite.

Under these circumstances, there is only one way this court could affirm the district court's holding that the denial of the existence of a contract in bad faith requires a special relationship under California law: predict that the California Supreme Court will overrule its holding in *Seaman's*. As a federal court sitting in diversity, how-

ever, such a prediction would be unprecedented. Accordingly, we find that the district court erred by granting a j.n.o.v. on the basis that the parties did not have a special relationship.[13]

f

The district court articulated a few alternative grounds for its j.n.o.v. on the bad faith claim. First, the court stated that there was insufficient evidence to support the jury's finding that Air Asia's denial of the existence of contract was in "bad faith." "Under *Seaman's* [a defendant] might be liable for tort damages if [it] denied any liability 'in bad faith and without probable cause, that the contract exists' or denied liability 'without probable cause and with no belief in the existence of a defense [stonewalling].' " *Multiplex*, 235 Cal.Rptr. at 21 (citation omitted).

■ The district court cited the testimony of various Air Asia employees that they had never heard of the alleged 1956 oral contract. But Herold, Air Asia's former Burbank office manager, testified that there was an oral agreement in 1956. More important, Air–Sea worked as Air Asia's freight forwarder and customshouse broker from about 1950 to 1966 without any written contract. The record indicates that these parties had a substantial relationship over this period that was never governed by a written agreement. This provides sufficient circumstantial evidence that the parties' commercial relationship was governed by some sort of oral agreement prior to 1966. Furthermore, it provides sufficient evidence that Air Asia acted in bad faith by defending this action on the grounds that no such oral contract existed.

■ The district court also stated that there was insufficient evidence that Air Asia denied "the existence of an oral agreement as such." The court implied

13. While we conclude that California law still recognizes a distinct tort for the denial of the existence of a contract in bad faith which does not turn on the presence of a special relationship, our decision should not be interpreted to

endorse the usefulness of the distinction between denying the existence of a contract and disputing the terms of a contract. We take California law as we find it.

that Air Asia at most denied the terms of the contract, not its existence. The jury, of course, returned a special verdict finding that Air Asia had denied the existence of the 1956 oral agreement. The district court's characterization of Air Asia's defense is unsupported by the record. Indeed, Air Asia continues to assert on appeal that "[t]here is indeed a credibility issue with respect to whether or not there ever was a 1956 oral agreement." Finally, the district court labeled Air Asia's denial of the existence of the 1956 agreement "privileged" because it was made in the course of this litigation. The district court cited no California authority for this proposition, and finding none ourselves, we reject it.

### B

■■■ Appellant also argues that the district court erred in entering a directed verdict against it on the attorney's fees claim. Appellant contends that reasonable minds could differ over whether the parties had an oral agreement that Air Asia would pay Air-Sea's attorney's fees incurred in enforcing the underlying contract.[14] Air Asia does not dispute that it agreed to pay certain of Air-Sea's legal expenses. Specifically, Air Asia concedes that it paid certain attorneys' fees incurred by Air-Sea in connection with Air-Sea's performance of its obligations to Air Asia. The parties differ, however, on whether this agreement provided for the payment of fees incurred in an action to enforce the 1956 contract.

The district judge found Rautenberg's testimony "wholly devoid of credibility." The court stated that it had "an abiding conviction that the verdict in this case was a manifest injustice brought about largely by artifice." Nonetheless, the court acknowledged that it was improper to enter

judgments n.o.v. on this basis because "there is evidence in the case which, if believed, would support the jury's conclusion on the point."

In entering a j.n.o.v., the district court "must not substitute its own credibility assessments and its weighing of the evidence for the jury's; it must limit itself to determining whether the jury's verdict is supported by substantial evidence." *McGhee v. Arabian American Oil Company,* 871 F.2d 1412, 1416 (9th Cir.1989); *see also Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1024 (9th Cir.1985) (for purposes of motion for j.n.o.v. "[i]t is the function of the jury ... to weigh conflicting evidence and judge the credibility of witnesses"), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

The district court, however, ran afoul of its own admonition that it is improper for the court to assess a witness' credibility in ruling on a motion for a j.n.o.v. The district court stated that "there is a total lack of evidence supporting the idea that there was a specific fee agreement with respect to enforcing the *terms of an oral agreement.*" This is simply not the case. Rautenberg testified that the agreement "positively and definitely" included such fees.

Given Rautenberg's unequivocal testimony, and the requirement that we construe the evidence in the light most favorable to appellant in assessing the j.n.o.v., *see Fleming,* 837 F.2d at 408, there was sufficient evidence to support the jury's verdict on the attorney's fees claim, and j.n.o.v. was improper.

### IV

■■■ The district court conditionally ordered new trials on the bad faith denial and attorneys' fees claims "[f]or the reasons and on the grounds" that it granted j.n.o.v.

---

**14.** Section 1717 of the California Civil Code reads:

In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is

the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Section 1717(a) governs the alleged agreement between the parties about payment of attorneys' fees incurred in connection with enforcing the good faith clause. *See Coast Bank v. Holmes,* 19 Cal.App.3d 581, 596, 97 Cal.Rptr. 30, 39 (1971).

as to those claims, "and for the reason that the jury's verdict in this case was grossly excessive." We have jurisdiction to review these new trial orders.[15]

### A

■ "The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party" in ruling on a motion for a new trial. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987); *Fount–Wip, Inc. v. Reddi–Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir.1978). We review an order granting or denying a motion for new trial for an abuse of discretion, although the district court should only enter an order granting a new trial based upon the insufficiency of the evidence if the verdict is against the great weight of the evidence. *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir.1987).

### B

■ Appellants' evidence on the 1956 oral contract and the attorney's fees claim was based almost exclusively upon Rautenberg's testimony.[16] The district court found both Rautenberg and Herold to be incredible because they had given prior

inconsistent deposition testimony. At trial, Rautenberg sought to explain his prior inconsistent deposition testimony, stating that initially he did not want to reveal the "secret" 1956 agreement. For purposes of ruling on Air Asia's motion for a new trial, however, the district court was free to reject Rautenberg's testimony. *See Landes*, 833 F.2d at 1371; *Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 487 (9th Cir.1985) (district court's credibility finding reviewed for clear error). Given the district court's express credibility findings, we affirm the new trial order on the bad faith denial of existence of contract claim and the attorney's fees claim.[17]

### V

Air–Sea seeks an order from this court reassigning the case to another judge on remand. Air–Sea alleges that "[t]he trial judge in this case was not a dispassionate jurist." It also contends that the district court improperly received extrajudicial information that affected its views of the evidence before the court.

### A

The key event to which Air–Sea points in support of its request occurred on April 9,

15. Appellees assert that it would not be appropriate for this court to review the conditional new trial orders. Rule 50(c)(1), however, permits this court to review these orders. "In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed *unless the appellate court has otherwise ordered.*" Fed.R. Civ.P. 50(c)(1) (emphasis added). While such review is discretionary with the appellate court, we have jurisdiction over the new trial order. *See, e.g., Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.*, 822 F.2d 267, 275 (2d Cir.1987); *Firestone Tire and Rubber Co. v. Pearson*, 769 F.2d 1471 (10th Cir.1985) (appellate court may order new trial where directed verdict found to be inappropriate); *Marino v. Ballestas*, 749 F.2d 162 (3d Cir.1984) (appellate court has discretion to review alternative order for new trial); *Gordon Mailloux Enter., Inc. v. Firemen's Ins. Co.*, 366 F.2d 740, 742 (9th Cir. 1966) ("We have, it is true, held that upon reversal of a judgment N.O.V., in which a new trial was conditionally granted, this court might also reverse the latter order and direct entry of judgment on the verdict forthwith.").

16. Herold also testified that Air Asia had agreed to terminate Air–Sea only for good cause and that the agreement included attorney's fees. As the district court noted, however, his testimony was inconsistent and he changed it only after appellants refreshed his recollection at a deposition. The district court found Herold's testimony to be incredible. Consequently, excluding both Rautenberg's and Herold's testimony, the verdict on the attorney's fees claim is against the great weight of the evidence.

17. We do not have jurisdiction to consider appellant's argument that the district court improperly entered a directed verdict on its unfair business practices claims. The Rule 54(b) order refers only to Air–Sea's "jury claims." The court indicated that the "jury claims" are "those claims of [Air–Sea] submitted to the jury as Special Verdicts [A] through J." The unfair business practices claims were disposed of on a motion for directed verdict; they were not submitted to the jury. Accordingly, we lack appellate jurisdiction. *See Sheehan*, 812 F.2d at 468.

1986, during the trial but out of the presence of the jury. The incident arose out of a minor point; Air–Sea sought to introduce "testimony with regard to the fact that Mr. Rautenberg was offered a medal by the CIA." Rautenberg had attempted to justify discrepancies between his trial and deposition testimony by explaining that his alleged secrecy oath had prevented him from being entirely truthful at his deposition. Air–Sea also wanted to rebut Air Asia's efforts to downplay Rautenberg's importance to the CIA.

The district court ruled against the introduction of the testimony about the medal. In doing so, the court stated: "He never took an oath for the CIA, and I know that, and I know it independently of this trial."

### B

■ This court has inherent authority to order reassignment to a different district judge, but such action is justified only in rare and extraordinary circumstances. *See United States v. Sears, Roebuck & Co.*, 785 F.2d 777 (9th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). In making this determination, we consider the following factors:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 779–80 (citations omitted). In *Sears*, this court reassigned the case in order to serve "the appearance of justice and the orderly administration of this court's appellate docket." *Id.* at 781. "The district judge ha[d] been adamant in his rulings," repeatedly dismissing the criminal indictment at issue in the case. This court waited until "the fourth pretrial appeal in th[e] case" before reassigning it. *Id.*

This court relied on the *Sears* case in reassigning a case in order "to preserve the appearance of justice." *Matter of Yagman*, 796 F.2d 1165, 1188 (9th Cir.), *amended*, 803 F.2d 1085 (9th Cir.1986), *mandamus granted*, 815 F.2d 575 (9th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). In *Yagman*, pervasive "attorney bickering and misconduct" had provoked "the district court's ire." This court observed that "the massive sanction award and the numerous allegations of bias and overreaching have combined with this poor lawyering to produce an entirely unfortunate end result: the fragile appearance of justice has taken a beating." *Id.*

### C

■ The district judge below was somewhat adamant in his rulings. The district court first found the jury's special verdicts inconsistent and entered j.n.o.v. on the breach of contract claim. This court granted Air–Sea's petition for mandamus, and the jury subsequently returned a substantial verdict for Air–Sea, only to have the district court once again enter j.n.o.v. Nonetheless, while we earlier reversed the district court's j.n.o.v. on the grounds that the jury's special interrogatories were not inherently inconsistent, in fairness, there was genuine ambiguity in the jury's verdicts. This case bears no resemblance to the *Sears* case, where the district court demonstrated an unwillingness to accede to this court's legal directives.

■ The district court also has expressed strong views about the credibility of Rautenberg, characterizing his testimony as "wholly devoid of credibility," "simply ridiculous," and "wholly incredible." The district court also observed that counsel for Air–Sea had "misled" the jury by blowing "cloak and dagger smoke" at it. But we have concluded that the district court did not commit clear error in finding Rautenberg's testimony incredible. Furthermore, unlike the *Yagman* case, the record in this case is not replete with evidence of personal animus between the lawyers and the court.

### D

■ This leaves only the district court's statement that it received evidence of Rautenberg's secrecy oath independently from the trial. The district court's reference was made out of the jury's presence, and the district court never instructed the jury that Rautenberg had not taken a secrecy oath.

The circumstances leading to the district court's receipt of this information, however, are hardly mysterious. The parties were well-aware that the district court was in communication with government lawyers concerning the role of classified information. Indeed, the district court entered a supplemental protective order regulating the admission of certain classified evidence, which Air–Sea does not challenge on appeal. Under these circumstances, we see no reason to reassign the case to a different district judge.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.