108 F.3d 337
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
GREAT WESTERN CAPITAL CORPORATION, Plaintiff-Appellee,
v.
INGERSOLL-RAND FINANCIAL CORPORATION; Concord Commercial
Corporation, Defendants-Appellants.
GREAT WESTERN CAPITAL CORPORATION, Plaintiff-Appellee/Cross-Appellant,
v.
INGERSOLL-RAND FINANCIAL CORPORATION; Concord Commercial
Corporation, Defendants-Appellants/Cross-Appellees.
 Nos. 95-56318, 95-56575.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 9, 1996.
Decided Feb. 18, 1997.
 
 Before: HALL, KOZINSKI and HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Ingersoll-Rand Financial Corporation ("Ingersoll"), as lead lender, and Great Western Capital Corporation ("Great Western"), as a loan participant, entered into a loan participation agreement (the "Agreement") involving loans to nineteen partnerships. Two of the partnerships, it was later discovered, were comprised of fraudulent investors. Great Western sued Ingersoll for fraudulently misrepresenting during Agreement negotiations that it had conducted due diligence, and for post-Agreement breach of a fiduciary duty for intentional concealment of certain facts once Ingersoll discovered the investor fraud. The jury was given a verdict form which asked whether Ingersoll was liable for either the misrepresentation or the breach of fiduciary duty claim. The jury found in favor of Great Western on the liability issue, and also specifically found that Great Western had not discovered Ingersoll's actions early enough to bar its claims under the statute of limitations. Ingersoll appeals, claiming the district court erred in various rulings and that the jury's verdict on the statute of limitations issue was not supported by the evidence. Great Western cross-appeals the amount of offsets the judge permitted against the jury's verdict.
 
 
 3
 I. Breach of Fiduciary Duty Claim.
 
 
 4
 Relying on Bank of the West v. Valley National Bank, 41 F.3d 471 (9th Cir.1994), Ingersoll made a motion in limine, asking the district court to exclude all evidence pertaining to Great Western's intentional concealment claim. Ingersoll argued that Great Western's alleged damages arose from entering the Agreement, and thus the damage occurred before any fiduciary duty commenced. The district court denied the motion, correctly pointing out that Bank of the West involved a different procedural posture: an appeal from a directed verdict because the plaintiff had failed to prove at trial that any damage arose from the fiduciary breach. Great Western, in contrast, argued that at trial it could and would show additional damages from the breach. Thus, especially given the procedural posture of Ingersoll's motion, the trial judge's decision was not an abuse of discretion.
 
 
 5
 II. Extrinsic or Parol Evidence.
 
 
 6
 Ingersoll also made a motion in limine to exclude evidence regarding representations Ingersoll may have made during Agreement negotiations that did not become a part of the final document. Under California law, even if terms of a contract are not apparently ambiguous, extrinsic evidence is admissible to prove a meaning to which the language is "reasonably susceptible." Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (Cal.1968) (en banc).
 
 
 7
 Great Western presented testimony that it believed Ingersoll's representation in the Agreement that each investor note "to the best of Seller's knowledge and belief is genuine," was really a representation that Ingersoll had performed due diligence. The definition of "genuine" in the Agreement indicates Ingersoll received the notes "in the ordinary course of business." From this, Great Western argued that Ingersoll was a lender and a lender would ordinarily conduct a credit investigation of a borrower; thus, Great Western contended, the definition of genuine in the Agreement further supported its understanding that Ingersoll had done due dilligence on the loans. Even if we assume, as Ingersoll argues, that these phrases are not "reasonably susceptible" to the meaning Great Western urges, admission of this extrinsic evidence testimony would not be reversible error, because other, properly admitted testimony also established that misrepresentations were made. In California, parol evidence is admissible to prove fraud, if it is independent of and does not contradict the terms of the contract. Bank of America Nat. Trust & Savings Assoc. v. Pendergrass, 4 Cal.2d 258, 263, 48 P.2d 659, 661 (Cal.1935). Thus, representations that were not addressed in the Agreement could have been introduced as evidence as long as they did not contradict the express terms in the contract. Great Western officials testified that Ingersoll represented to them that it had performed due diligence and random spot checks on the partnerships and underlying partners. This testimony was properly admitted under the fraud exception to establish Ingersoll's misrepresentations.
 
 
 8
 III. Statute of Limitations.
 
 
 9
 Great Western presented testimony that it did not have notice of Ingersoll's due diligence misrepresentation until 1990, when Great Western and Ingersoll were named as co-defendants in a lawsuit. During discovery in the action, Great Western obtained an internal investigation of Ingersoll's on the lack of due diligence with respect to the loans involved in the Agreement. Great Western officials testified that in reading the report, they realized for the first time that the amount of inquiry performed by Ingersoll had been misrepresented.
 
 
 10
 Ingersoll introduced evidence that Great Western was notified of the investors' fraud in 1986, and argued that Great Western should have been put on notice of Ingersoll's misrepresentation at that time as well. However, Mr. Moore, a Great Western official, testified that he had been involved in other deals where the parties had conducted due diligence but the deals turned out phony anyway. This supports Great Western's contention that even on the discovery of the investor fraud, a reasonable person would not have necessarily suspected that Ingersoll had misrepresented its due diligence. Moore also testified that he examined Ingersoll's files shortly after being notified of the investor fraud, and it appeared that Ingersoll had conducted due diligence, since there were TRW reports, tax returns, etc., in the files.
 
 
 11
 In sum, the fraud Great Western had notice of in 1986 was different from the fraud it claims Ingersoll perpetrated. While the frauds stem from related subject matter, notice of one would not automatically lead to notice of the other. There was substantial evidence from which a jury could conclude that Great Western did not and should not have discovered Ingersoll's fraud until 1990.
 
 
 12
 IV. Motion for New Trial.
 
 
 13
 A district court should grant a motion for new trial only when the great weight of the evidence is against the jury's verdict. Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 190 (9th Cir.1989), cert. denied, 493 U.S. 1058 (1990). It is true that as to the intentional concealment issue, the record does not reveal that Great Western introduced any evidence that it sustained additional damages from the alleged concealment. However, as Ingersoll admitted at oral argument, because of the way the question was presented to the jury on the verdict form, Ingersoll needed to establish that the great weight of the evidence was against the verdict on both claims. Ingersoll simply cannot meet this substantial burden with respect to the fraud claim. The district court therefore did not abuse its discretion in denying the motion for new trial.
 
 
 14
 V. Calculation of Offsets.
 
 
 15
 The jury returned a verdict equal to the amount Great Western paid to participate in the two fraudulent loans. Both parties agreed that this award should be offset by amounts actually collected and paid to Great Western on these loans, and stipulated that the judge would calculate the proper offset amount prior to entering judgment. In addition to amounts collected on the loans, the parties also agreed to offset Great Western's 20.44% interest in real property Ingersoll had acquired through foreclosure for their mutual benefit.
 
 
 16
 In order to collect on the loans and foreclose on the property, Ingersoll incurred attorney's fees. Ingersoll also paid off a prior lienholder on the property and made property tax payments. Ingersoll claimed all of these amounts should be offset against the verdict. The court permitted deductions for 20.44% of the mortgage payments to the first lienholder and the property taxes. The court denied offsets for the legal fees, however, finding that these were incurred through Ingersoll's acts of servicing the loan, and that the Agreement required Ingersoll to service the loan without charge or fee to Great Western. Ingersoll appeals the denial of offsets for attorney's fees, and Great Western cross-appeals the district court's offset of the mortgage payments and property taxes.
 
 
 17
 We agree with the district court that the attorney's fees, as loan "servicing" costs, should not be offset. Ingersoll submitted evidence that typical participation agreements classify ordinary loan administration costs (e.g., staff, telephone expenses, etc.) differently from "outside" or unusual loan expenses (e.g., collection costs), and require percentage contribution for the latter. Even though it may be true that attorney's fees are not typical loan servicing expenses, the Agreement in this case does not distinguish between "ordinary" and "outside" expenses related to loan servicing. Moreover, Ingersoll agreed to make payments to Great Western without set-off, and nowhere in the Agreement is Great Western obligated to contribute to collection costs.
 
 
 18
 The payments of principal and interest to the first lienholder on the property, however, should not have been offset because these amounts were double-counted. The offset for Great Western's 20.44% interest in the property ($347,480) was already based on an appraisal of a lien-free $1.7 million property. Thus, the property interest offset already accounted for the sums Ingersoll spent paying off the lien. As Ingersoll acknowledged in motions before the district court, if it had not paid off the prior lien, Great Western's equity interest (and offset) would have only been $270,000.
 
 
 19
 The payments of property taxes should not have been offset either. Based on the jury instructions, Great Western was entitled to recover the difference between: (1) the value of what it actually received and (2) what it would have received if Ingersoll's representations had been true. Payment of the property taxes was not "value received" by Great Western. Property tax is a burden that accompanies the ownership of real property, and, notably, a burden for which Great Western did not bargain. Ingersoll's payment of the taxes did not make the value of Great Western's interest in the property worth more than the $340,000 that was appropriately offset from the verdict.
 
 
 20
 The district court's decision on liability is AFFIRMED. The amount of the judgment is VACATED and REMANDED for recalculation consistent with this disposition.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3