8 F.3d 27
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Lowell HALL; Denise Hall, Plaintiffs-Appellees,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellant.
 No. 91-36053.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 3, 1993.
Decided Oct. 15, 1993.
 
 Before: TANG, POOLE, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 A jury found that a General Motors car parked in the plaintiffs' built-in garage started a fire that spread to the rest of their home. It awarded the plaintiffs $230,000 on a products liability theory. General Motors disputes the products liability theory applied in the case, contends the plaintiffs' experts gave speculative testimony, and challenges the district court's refusal to impose sanctions for alleged destruction of evidence. We now affirm.
 
 
 3
 One night in May 1987, the plaintiffs, Lowell and Denise Hall, discovered heavy black smoke coming from their garage. After gathering their children and leaving the home, they saw flames coming from the bottom of the middle garage door of their three-car garage. Both a neighbor and an arriving firefighter saw flames coming predominantly from the center garage door. The fire spread to the rest of the home, causing extensive damage.
 
 
 4
 The middle garage stall contained a General Motors Buick. The left garage stall contained a Toyota. The right stall contained boxes of personal possessions, shop and lawn tools, a Coleman camp stove with no gas tank, and possibly a box containing lacquer thinner, linseed oil, cement cleaner, and spray paint.
 
 
 5
 An experienced county fire department official investigated the fire and concluded that it had begun in the interior of the Buick. He based this conclusion on a "definitive V pattern" of burn indicating the fire came from the center stall; on the fact that the interior of the Buick was completely consumed by the fire, while portions of the Toyota's interior remained unburned; on the condition of the electrical wiring harness inside the Buick, which showed "beading" on electrical wires, among other indications; and on other factors.
 
 
 6
 The Halls' insurer had its own fire expert examine the fire site, and he, also, concluded that the fire started in the Buick's electrical system. General Motors' expert, who had not inspected the fire scene, concluded that the fire started in the right bay of the garage, not the center bay.
 
 
 7
 The Buick's history was unexceptional. It had been driven 30,000 miles at the time of the fire. The Halls purchased it 18 months earlier from a dealer in California, where it had been a demonstrator. The car had never been in an accident, and had not been modified or abused in any way by the Halls. The Halls never changed the car's fuses.
 
 
 8
 A week before the fire, the car had experienced ignition problems.
 
 
 9
 In a letter to General Motors after the fire, the Halls' insurer wrote that it believed the Buick started the fire and asked General Motors to contact the company if it wished to inspect the home and vehicles. A local representative of General Motors did arrive to inspect the Halls' home, but, as it turns out, had come without knowledge of the insurer's letter. The Halls' insurer subsequently had the Toyota and Buick sold for salvage.
 
 
 10
 At trial in the resulting diversity action the court allowed the Halls to proceed on a "general defect theory," under which product liability could be established without identification of a specific defect. The jury returned a $229,870 verdict against General Motors.
 
 
 11
 General Motors disputes the applicability of the general defect theory, contends the plaintiffs should have been sanctioned for premature destruction of the two automobiles, and challenges the Halls' experts' testimony as speculative.
 
 JURISDICTION
 
 12
 Title 28 U.S.C. sections 1332(a) and 1441 gave the district court subject matter jurisdiction over a diversity action removed to federal court. Our jurisdiction comes from 28 U.S.C. § 1291.
 
 STANDARDS OF REVIEW
 
 13
 The General Defect Theory. The district court's construction of Oregon law is reviewed de novo. Westlands Water Dist. v. Amoco Chem. Co., 953 F.2d 1109, 1111 (9th Cir.1991). In construing state law in a diversity case, "we follow the decisions of the state's highest court." Harvey's Wagon Wheel, Inc. v. Van Blitter, 959 F.2d 153, 154 (9th Cir.1992) (citation omitted). " '[W]here the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it.' The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis." Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 186 (9th Cir.1989) (citation omitted), cert. denied, 493 U.S. 1058 (1990).
 
 
 14
 The Denial of Sanctions. The district court's denial of sanctions is reviewed for an abuse of discretion. Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 602 (9th Cir.1991). The district court's underlying factual determinations are reversible only if clearly erroneous. Id.
 
 
 15
 The Expert Witness Testimony. The district court "has broad discretion in admitting expert testimony and its decision will be sustained unless it is 'manifestly erroneous.' " Rent-A-Center, 944 F.2d at 601 (quoting Taylor v. Burlington N.R.R., 787 F.2d 1309, 1315 (9th Cir.1986)). The court's denial of General Motors' motions for judgment notwithstanding the verdict and for a directed verdict are reviewed de novo. Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.1992), petition for cert. filed, 62 U.S.L.W. 3165 (U.S. Aug. 5, 1993) (No. 93-315). The reviewing court "must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support only a verdict for the moving party." Id.
 
 ANALYSIS AND DISCUSSION
 
 16
 I. Applicability of the "General Defect Theory"
 
 
 17
 It is black-letter Oregon law that the manufacturer of a defective product, unreasonably dangerous to the user, will be strictly liable to a plaintiff who can show either (1) a dangerous defect in manufacture, or (2) an unreasonably dangerous design. See, e.g., Longenecker v. General Motors Corp., 594 F.2d 1283, 1287 (9th Cir.1979) (applying Oregon law).
 
 
 18
 That much is undisputed in this case.
 
 
 19
 What is disputed is the applicability of a third method for plaintiffs to show a product is unreasonably dangerous. Called the "general defect theory" by General Motors and the "indeterminate defect theory" by the Halls, this method comes into play when the plaintiff cannot point to a specific flaw either in manufacture or design:
 
 
 20
 In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user.
 
 
 21
 Heaton v. Ford Motor Company, 435 P.2d 806, 808 (Or.1967).
 
 
 22
 The idea behind the Heaton rule is that if a product fails in unusual, unexpected circumstances, for example a truck spontaneously veering off the road, then "the inference is that there was some sort of defect, a precise definition of which is unnecessary." Id. Accord Brownell v. White Motor Corporation, 490 P.2d 184, 185-87 (Or.1971) (truck veered off the road).
 
 
 23
 The rule is appropriately invoked only when the product "is unchanged from the condition it was in when sold and the unusual behavior of the product is not due to any conduct on the part of the plaintiff or anyone else who has a connection with the product." Brownell, 490 P.2d at 187.
 
 
 24
 The jury was instructed on the general defect theory. General Motors argues that the theory was inapplicable for three reasons. First, it argues that the theory is no longer good law in Oregon. Second, it argues that even if the theory is good law, it should only be applied where the evidence is indisputable that the problems began in the manufacturer's product, rather than some other product (such as the other car in the garage, or the other ignition sources there). Finally, General Motors argues that, as a matter of law, a consumer would not have reasonable expectations about whether the Buick would start a fire. As explained below, we find these arguments unpersuasive.
 
 
 25
 A. Does the Theory Still Exist in Oregon?
 
 
 26
 General Motors contends that the general defect theory no longer exists in Oregon. It cites Oregon Court of Appeals cases, statutory enactments, and other materials it argues demonstrate the infirmity of the theory. We conclude, however, that the general defect theory is still viable Oregon law.
 
 
 27
 First, it is indisputable that the Oregon Supreme Court has definitively embraced the rule, and has not itself retreated from that position. See Heaton, 435 P.2d at 808-09; Brownell, 490 P.2d at 186. Hence, this is not a situation in which the Supreme Court has never spoken on a subject, or has cast fresh doubt on an earlier ruling.
 
 
 28
 The only question, then, is whether some other legal development has abrogated the theory. General Motors points to two developments as candidates: first, the legislature's codification of the law of products liability in 1977; and second, state appellate cases questioning the rule. But neither development sounded the death knell for the general defect theory.
 
 1. The 1977 Codification
 
 29
 Beginning in 1977, Oregon codified its products liability jurisprudence, which previously had been purely a matter of common law. See Or.Rev.Stat. § 30.900 et seq.; Ewen v. McLean Trucking Co., 706 P.2d 929, 932 (Or.1985). General Motors argues that this statute, which does not specifically mention the general defect theory,[1] eliminated the theory from Oregon law.
 
 
 30
 But there are several problems with this view. First, it is unlikely that the Oregon codification was intended to change substantive law. The new statutes were apparently intended simply to codify existing common law. Ewen, 706 P.2d at 932. At the very least, it is clear that the codification was meant to enact Restatement (Second) of Torts § 402A and its commentary, the same Restatement provision from which the Oregon Supreme Court derived the general defect theory announced in Heaton. Or.Rev.Stat. § 30.920(3); Ewen, 706 P.2d at 932; Heaton, 435 P.2d at 808.
 
 
 31
 Second, cases decided after the statutory codification have employed the general defect theory. See Seeborg v. General Motors Corp., 588 P.2d 1100, 1103 (Or.1978); Longenecker v. General Motors Corp., 594 F.2d 1283, 1287 (9th Cir.1979). While General Motors asserts that these cases were "filed" before 1977, the fact that the cases do not even mention the new codification, not even to assert that the new provisions were not retroactive, suggests that the codification was not seen as a departure from prior law.
 
 
 32
 Third, despite the passage of over fifteen years since the statutory codification, General Motors does not point to any case law or legislative history indicating the codification overruled Heaton and Brownell.
 
 
 33
 All of this makes it unlikely that the 1977 codification brought with it an implicit rejection of the general defect theory.
 
 2. The State Appellate Decisions
 
 34
 General Motors also argues that several state appellate decisions have cast doubt on the viability of the general defect theory.
 
 
 35
 The first of these decisions is Weems v. CBS Imports Corp., 612 P.2d 323 (Or.Ct.App.), rev. denied, 289 Or. 659 (1980). In Weems, a manufacturer of cotton pajamas appealed a verdict for a plaintiff who was injured when the pajamas caught fire. Id. at 324. The manufacturer objected to a general defect jury instruction taken from Heaton. The appellate court agreed that the instruction was improper, Weems, 612 P.2d at 325-26, but the basis of its conclusion was that Weems was a defective design case, i.e., one in which the plaintiff had pointed to a specific defect in the design of the product that made it dangerous (in Weems, the failure to use flame retardant in the pajama fabric). Id. The court held that in a defective design case, the Heaton rule--which supplies a basis for liability where no specific flaw can be discovered--is inapplicable. Id. The court's holding thus says nothing about what should happen in a case where, as here, the plaintiffs allege no specific design defect.
 
 
 36
 Although Weems did go on in dicta to question whether the general defect theory was still "viable" in Oregon, the court was at pains to indicate that "we need not decide here" whether the theory was still good law. 612 P.2d at 326. We decline to take this dictum--from a design defect case decided by an intermediate appellate court--as evidence that the Oregon Supreme Court is ready to reverse itself on the general defect theory. As we have said, the state Supreme Court has unequivocally embraced the theory. Absent clear evidence of a change of view, we will not impute to that court a contrary conclusion.
 
 
 37
 Nor is the other appellate court decision cited by General Motors any greater help to its theory. See Helms v. Halton Tractor Co., 676 P.2d 347, 348-49 (Or.Ct.App.) (design defect case; following Weems, but specifically limiting its holding to the design defect context), rev. denied, 679 P.2d 1367 (Or.1984). Hence, General Motors' appellate court decisions do not demonstrate the demise of the general defect theory.[2]
 
 
 38
 In sum, the Oregon Supreme Court has not itself said a reversal is near for the general defect theory, and other authorities--both statutory and decisional--are at best inconclusive. Under these circumstances we must leave the law as it is until the Oregon Supreme Court changes it. The district court's instruction on the general defect theory was not error.
 
 
 39
 B. If the Theory Exists, Is it Applicable Here?
 
 
 40
 General Motors next argues that even if the general defect theory is still good law, the district court erred in applying it in the circumstances of this case.
 
 
 41
 1. Whether there was a performance failure.
 
 
 42
 General Motors argues that "[i]n each Oregon case applying the general defect theory, there was undisputed evidence of unusual product performance." In other words, General Motors argues that in other cases there is no question that the manufacturer's product malfunctioned--for example a truck spontaneously veering off the road. The only question is whether the product's malfunction was the result of a manufacturer's defect. But here, says General Motors, the jury must draw two inferences--first that the fire in fact began in the Buick, rather than in some other part of the garage; and second, that the reason the Buick started on fire was that is was defective (rather than, for example, because an unextinguished cigarette was left in the car). General Motors calls this an impermissible "stacking of inferences."
 
 
 43
 This argument fails because "stacking of inferences" is commonplace in products liability cases. In Longenecker v. General Motors Corp., 594 F.2d 1283, 1287 (9th Cir.1979), the Ninth Circuit rejected a similar "stacking of inferences" argument in a case where a Chevrolet suddenly swerved off the road. There also, General Motors argued that the jury had a double set of inferences to draw: first that it was the Chevrolet that caused the car to swerve, not the driver's negligence; and second, that the car's malfunction was the result of a product defect. Id. The court agreed that the jury had two inferences to draw but saw nothing improper in such a situation. It approved the use of the general defect theory. Id.
 
 
 44
 In exactly the same way, there was nothing improper in letting the jury in this case first conclude that the fire began in the Halls' Buick, and then that a defect in the product caused the fire.
 
 
 45
 2. Whether consumer expectations were violated.
 
 
 46
 General Motors argues that it would not be obvious to the average consumer that the a defect in the Halls' Buick caused the fire. But the proper test under Heaton is whether "the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations." Heaton, 435 P.2d at 808. Under this standard, all a jury would have to find is that a reasonable car owner would not expect a car spontaneously to catch fire. It is not necessary for the average car owner to know that a product defect in the car caused the fire. The whole point of the Heaton rule is that a jury may infer a product defect when a malfunction occurs in unexpected circumstances. General Motors is thus incorrect to assert that it must be "obvious to the average consumer that a defect in the Buick must have caused the fire."
 
 
 47
 3. Whether other causes had been ruled out.
 
 
 48
 Finally, General Motors argues that the Halls did not prove that the defect in the Buick existed when the car left the factory. See Quirk v. Ross, 476 P.2d 559, 562-63 (Or.1970) (a product's age and its treatment since purchase are relevant, though not dispositive, in determining whether the product left the factory in defective condition).
 
 
 49
 But the plaintiffs did present evidence that the defect in the Buick was not the result of its treatment since it left the factory. And the court specifically instructed the jury that they must so find. General Motors simply disagrees with the jury's conclusion. But that, of course, is not grounds for reversal. Accordingly, General Motors' claim that the general defect rule was inapplicable must be rejected.
 
 II. The District Court's Denial of Sanctions
 
 50
 General Motors claims the Halls prematurely destroyed the Buick salvage, and should have been sanctioned for spoliation of evidence.
 
 
 51
 We decline to reverse the district court's sanctions decision. The record shows that General Motors was given notice of the fire and an opportunity to inspect the burned home and the two automobiles. The Halls also point out that it was not they, but their insurer, that eventually sold the salvage.
 
 
 52
 Moreover, although General Motors cites cases authorizing the district court to sanction a party for the destruction of evidence, nothing requires the court to do so. As General Motors concedes, the matter is entirely in the district court's discretion. The district court did not abuse that discretion here.
 
 III. The Expert Witness Testimony
 
 53
 Finally, General Motors argues that the Halls' experts based their testimony on speculation. It contends that the district court erred in not striking the experts' testimony and in not directing a verdict for General Motors. But General Motors establishes neither that the district court abused its discretion in allowing the testimony nor that the evidence permits only one reasonable conclusion.
 
 
 54
 General Motors complains that the experts' testimony was speculative because it was based on the inference that "beading" found on wires within the Buick suggested the fire started there. General Motors vigorously disputes the validity of that inference. However, the district court cogently refuted these arguments:
 
 
 55
 GM's arguments are based on the idea that the experts' opinions as to the origin of the fire were based solely on the beading found on the electrical wires in the Buick. However, the testimony of Campbell and Farber was based not only on the beading found on the wires, but also on the fire patterns, the meltdown of the main wiring harness in the Buick, the discoloration of wires in the Buick, and the fact that there had been ignition problems with the Buick shortly before the fire. The testimony of Campbell and Farber was appropriate and consistent with plaintiffs' theory.
 
 
 56
 These multiple converging lines of evidence amply support the district court's decision. It was not an abuse of discretion for the court to deny General Motors' motion to strike. Nor can it be said, given this breadth of evidence, that the only reasonable conclusion the jurors could draw was that the fire started outside of the Buick.
 
 
 57
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The statute, in relevant part, provides:
 "(1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition if:
 (a) The seller or lessor is engaged in the business of selling or leasing such a product; and
 (b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.
 * * *
 (3) It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)...."
 Or.Rev.Stat. § 30.920.
 
 
 [2]
 General Motors also finds significant that the uniform jury instruction on products liability was modified to remove the general defect theory. The drafters of the instruction abandoned that subsection because of confusion and perceived inconsistencies in Oregon's products liability law. Willamette Essential Oils, Inc. v. Herrold & Jensen Implement Co., 683 P.2d 1374, 1377 n. 3 (Or.Ct.App.1984). Much of this confusion, however, came from other aspects of products liability law than the general defect theory. See id. (attributing the confusion to the Oregon courts' indecision about whether a reasonable seller or a reasonable buyer standard determines defectiveness)